J-S89017-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF M.L.A.S., JR., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.L.A.S., SR., FATHER | No. 2343 EDA 2016 |

Appeal from the Decree June 24, 2016
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-A0028

| | |
|---|---|
| IN RE: ADOPTION OF M.R.T.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.L.A.S., SR., FATHER | No. 2344 EDA 2016 |

Appeal from the Decree June 24, 2016
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-A0029

| | |
|---|---|
| IN RE: ADOPTION OF J.A.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.L.A.S., SR., FATHER | No. 2345 EDA 2016 |

Appeal from the Decree June 24, 2016
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-0030

IN RE: ADOPTION OF J.L-A.S., A MINOR     IN THE SUPERIOR COURT OF
PENNSYLVANIA

APPEAL OF: M.L.A.S., SR., FATHER

No. 2346 EDA 2016

Appeal from the Decree June 24, 2016
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-A0031

BEFORE:  SHOGAN, J., MOULTON, J., and FITZGERALD, J.[*]

MEMORANDUM BY MOULTON, J.:       **FILED JANUARY 04, 2017**

M.L.A.S., Sr. ("Father") appeals from the June 24, 2016 final decree entered in the Montgomery County Court of Common Pleas terminating his parental rights to M.L.A.S., Jr., born in March 2007, M.R.T.S, born in January 2005, J.A.S., born in January 2010, and J.L.A.S., born in July 2008 (collectively "Children").  We affirm.

The trial court held a shelter care hearing on February 25, 2015, and the trial court issued a dispositional order finding Children dependent on

_____

[*] Former Justice specially assigned to the Superior Court.

- 2 -

March 17, 2015.[1] On January 22, 2016, the Montgomery County Office of Children and Youth ("OCY") filed petitions to terminate Father's parental rights. The trial court held a three-day hearing on June 8, 2016, June 9, 2016, and June 24, 2016. On June 24, 2016, the trial court granted the petitions to terminate Father's parental rights to Children, finding termination proper under 23 Pa.C.S. §§ 2511(a)(1), (a)(2), and 2511(b).[2]

On July 22, 2016 Father filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2).[3]

On appeal, Father raises the following issue:

> THE TRIAL COURT ERRED WHEN IT TERMINATED FATHER'S PARENTAL RIGHTS WHERE THE EVIDENCE PRESENTED WAS INSUFFICIENT TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE TO DEMONSTRATE THAT THE NEEDS AND WELFARE OF THE CHILDREN WOULD BE PROMOTED BY TERMINATING PARENTAL RIGHTS.

Father's Br. at 2.

---

[1] Children previously were placed in OCY custody in June of 2011. J.A.S. and J.L.A.S. were returned to Mother's care on May 7, 2013, M.R.T.S was returned on June 18, 2013, and M.L.A.S., Jr. was returned on June 22, 2013. N.T., 6/8/16, at 162.

[2] On June 24, 2016, the trial court also granted the petitions to terminate Mother's parental rights. Mother did not appeal.

[3] The trial court orally issued its findings of facts and conclusions of law at the conclusion of the hearing. The trial court adopted this reasoning in its Rule 1925(a) opinion.

We review a trial court's order terminating parental rights for an abuse of discretion. ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012). Accordingly, if the trial court's factual findings are supported by the record, we review the order "to determine if the trial court made an error of law or abused its discretion." ***Id.*** An abuse of discretion "does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** (internal citations omitted).

The Pennsylvania Supreme Court has explained the reason for applying an abuse of discretion to termination decisions:

> [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***Id.*** at 826-27 (internal citation omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing

- 4 -

evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

Father concedes that the trial court properly found grounds for termination pursuant to §§ 2511(a)(1) and (a)(2). Father's Br. at 5, 8. He argues, however, that the trial court erred when it found termination was proper pursuant to § 2511(b). *Id.* at 7. He argues OCY failed to establish, by clear and convincing evidence, that termination of his parental rights was in Children's best interests. *Id.* at 10-12. Father argues that OCY presented "[v]ery little testimony" concerning the strength of Father's parental bond. *Id.* at 10. He argues that the caseworker believed there was a bond and OCY presented no testimony to determine the closeness of the bond or the effect that termination would have on any existing relationship. *Id.* at 11. He further maintains that although the case worker responded "no" when asked whether Children would suffer harm if parental rights were terminated, OCY did not elicit any testimony to determine the basis of the opinion. *Id.* He notes that most testimony received at the hearing addressed Mother's bond or lack thereof, and there was little evidence as to Father's bond. *Id.*

We have discussed our analysis pursuant to section 2511(b) as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and

citations omitted).

Here, the trial court found:

> [T]hese emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security and stability.
>
> . . .
>
> This Court held that the determination of the child's needs and welfare requires considering the emotional bond between the parent and the child. The utmost attention should be [paid] to discerning the effect on the child of

permanently severing the parental bond. . . . Section (b) of the statute requires the Court to give primary consideration to the developmental, physical and emotional needs of the child. The Superior Court in interpreting the Adoption Act has held that the health and safety of the child supersedes all other considerations. [**In re T.S.M.**, 71 A.3d 251 (Pa.Super. 2013)].

In considering the child's needs and welfare, a court must consider the role of the parental bond in the child's life. I am required by prior case decisions to fully consider whether a parental bond exists to such an extent that severing this natural relationship would be contrary to the needs and the welfare of the children. The Pennsylvania Supreme Court has observed a delicate balance between preserving that family unit and in presenting a state of constant uncertainty and limbo for children who have no reasonable prospects for returning home to the care of their natural parents. In such a case, the Supreme Court in [**In re William L.**, 383 A.2d 1228, 1241 (Pa. 1978)] stated:

> Where, as here, disruption of a family has already occurred and there is no reasonable prospect for reuniting [the family] without serious emotional harm to the child[,] . . . the issue is not whether the state should intrude to disrupt an ongoing family relationship, but whether the state should seek to preserve in law a relationship that no longer exists in fact, with the result that the [children are] consigned indefinitely to the limbo of foster care or the impersonal care of institutions.

So to translate that, are these four children[4] to remain in foster care and limbo for the next umpteen years or next

---

[4] The trial court found that Children:

[A]ll have issues. Dr. Toso credibly testified about the special needs of [M.R.T.S.] and [M.L.A.S, Jr.]. [M.L.A.S., Jr.] has ADHD. . . . [M.R.T.S.] was diagnosed also with ADHD and has an adjustment disorder. Dr. Toso credibly testified that [J.L.A.S.] suffers from a lot of issues,

*(Footnote Continued Next Page)*

- 7 -

one year even, or is there some stability, some consistency in their life, knowing that they are going to go to the same school, that they are going to come home to the same address every day. I have to weigh that against the parental bond that exists between their natural parents.

In this case, the testimony clearly established that, although there is affection and each parent cares for, plays with the children, the birth parents have not maintained sufficient and consistent contact. And I do, however, observe and I heard testimony that there was or is a parental bond with the natural parents. That varied, though, especially according to the testimony of Dr. Toso. She stated that the greatest parental bond existed between [D.W.][5] and his mother, his birth mother, and that's probably because they have been together for so long. And the minimal parental bond existed with [J.A.S.] probably because she is the youngest. And the testimony that I received about a parental bond between the other children, [M.L.A.S., Jr.] and [M.R.T.S.], showed that there does exist one, but the overriding testimony that this Court found credible and adopted was that terminating the parental rights would not detrimentally harm the children despite the existence of a parental bond.

Therefore, I find from the evidence and testimony that termination of birth father's and the birth mother's rights does serve the needs and interests, the needs and welfare of each of the children, and termination of the parental rights of birth mother and birth father will not irreparably harm any of the children.

On this day, based upon the facts presented and the law, I must enter a final decree terminating the parental rights of birth mother, . . . and [Father] to each of the four children

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

including bathroom issues. [J.A.S.] was cited as having little recall of her birth mother except for those times when there were the sporadic visits or supervised visits.

N.T., 6/24/16, at 98-99.

[5] D.W. is a sibling of Children, but Father is not D.W.'s father.

- 8 -

which are the subject of this petition: [M.L.A.S., Jr., M.R.T.S., J.A.S, and J.L.A.S.]

I was extremely encouraged -- and I am addressing [Father] at this point -- by a statement that you made when you were sitting up here testifying, and you said: No matter what happens, they will always be your children and you will see them as that you would continue to follow through with the plans that you have, that you so meticulously researched and put into place. I hope you mean that. I really do. Because you are right, they will always be your children, but just think about how much more, because at some point in time they will be grown. They are going to grow up and despite anything that this Court has done or will do you will have a relationship with your children. It happens. I have seen it. But if you follow through on what you have planned there, your relationship, trust me, will be that much better; it will be a much better relationship.

N.T., 6/24/16, at 106-10.

The trial court's factual conclusions are supported by the record. The evidence and testimony introduced at the hearing included, among other evidence, that Father attended only 27 of 59 weekly visits offered to him from March 2015 through May 2016.[6] *See* OCY Exh. 12, Visitation Log – Father. Further, Rachel Wise, the OCY caseworker assigned to the family

_____

[6] OCY canceled one visit, but Father canceled the remaining visits. N.T., 6/9/16, at 15-20. Although Father had to cancel some visits because he did not have permission from his parole officer and he was late to some visits because he relied on Septa bus routes, Father did not provide explanations for many of the cancellations. *Id.* The cancellations included a period between September 6, 2015 and December 29, 2015 where Father did not see Children. *Id.* at 75; *see* OCY Exh. 12, Visitation Log – Father. Father stated that he did not visit during this time because he was "embarrassed" about a positive drug screen and he "needed time to collect his thoughts" and to "talk[] to a counselor." N.T., 6/24/16, at 63.

found that although Children have a bond with Father, Father is not "in tune" to the needs of Children and struggles to manage Children's behaviors during visitation. N.T., 6/8/16, at 205, 208-09. Ms. Wise further testified that Father had never parented or cared for Children for any significant period of time. *Id.* at 210. This was confirmed by Father's testimony, in which stated that he had cared for Children without assistance for only one week in 2011. N.T., 6/24/16, at 85. In addition, Ms. Wise testified that although Children are occasionally upset at the end of a visit with Father, they do not remain upset after the visit has concluded. N.T., 6/8/16, at 208.

Ms. Wise further testified that Children had suffered much instability in their lives. N.T., 6/8/16, at 211-12. Since 2011, they had spent 40 months in foster care, with the most recent stay in foster care beginning in February 24, 2015, *id.* at 177, 179, almost 14 months before the termination hearing. Father was unable to provide the stability Children required.[7] *Id.* at 212.

---

[7] Ms. Wise stated that at the shelter care hearing Father stated he wanted to move into the house where Mother was residing and have Children reside with him there. N.T., 6/8/16, at 179. Ms. Wise explained to him that this scenario was not an immediate option. *Id.* On the day before the disposition hearing, Father told Ms. Wise his hands were tied because he continued to reside in the half-way house and did not have family resources to pursue. *Id.* Although Father no longer resides at the half-way house, he resides in a one-bedroom apartment, does not have sufficient space for Children, and cannot afford a larger space. *Id.* at 203-04; N.T., 6/24/16, at 60, 82.

We conclude that the trial court did not err or abuse its discretion in finding that terminating Father's parental rights would serve the developmental, physical, and emotional needs and welfare of Children.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/4/2017